UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

William Jones                   :  Case No. 1:09-cv-286
                                :
     Plaintiff,                 :
                                :
vs.                             :
                                :
AKKO Fastener, Inc.,            :
                                :
     Defendant.                 :

**ORDER**

Before the Court is Defendant's motion for summary judgment.
(Doc. 27)  Plaintiff opposes the motion (Doc. 36), and Defendant
has filed a reply.  (Doc. 44) Defendant seeks summary judgment on
Plaintiff's claims of age, disability, and ERISA discrimination
filed after Jones was terminated from his job with Defendant.
For the following reasons, the Court will grant Defendant's
motion.

**FACTUAL BACKGROUND**

Plaintiff William Jones worked for Defendant AKKO Fastener
for many years, starting in 1973 as a washer operator.  Jones
gradually worked his way up through several manufacturing
production positions, and in 1998 Jones was promoted to the
position of Production Manager for manufactured parts.  AKKO
manufactures and distributes various types of fastening products,
such as screws, bolts and rivets.  AKKO is privately owned by
members of the Fernandez family.  Nestor Fernandez is President

-1-

of the company, and was Jones' direct supervisor.  AKKO has two main divisions: the Manufactured Parts division that manufactures products from raw materials, and the Purchased Parts division, which purchases and distributes pre-made products.

AKKO hired Ed Beck in 2001 as the Distribution Procurement Manager for the purchased parts division.  Beck took over Jones' responsibilities for AKKO's shipping department at that time, leaving Jones with management for the header and roller manufacturing departments.

Jones suffers from congenital aortic valve disease, and had his aortic valve replaced in 1980.  He had to repeat that surgery in 1989.  After suffering congestive heart failure in 1996 he underwent a third valve replacement and had a pacemaker implanted.  Fernandez testified that in addition to Jones' condition, he knew that other AKKO employees had various health problems.  Charles Eisenmann had undergone heart bypass surgery and had diabetes.  Robert Kennedy had a heart condition, and Fernandez knew that on occasion Kennedy had to leave work to go to the hospital in an ambulance.  Jeff Karr had a breathing disorder (Karr himself describes it as obstructive pulmonary disease).  Fernandez stated that he was not aware that Karr's condition affected his work.  Mike Gibson had diabetes, and his wife had some medical issue that Gibson had mentioned to Fernandez.  (Fernandez Deposition at pp. 130-132)

-2-

Jones testified that Fernandez made comments to Jones about AKKO's older employees and their poor health, as well as complaining about AKKO's increasing health insurance costs.  For example, after Charles Eisenmann took a medical leave in 2007, he returned to work part-time.  Fernandez told Jones to terminate Eisenmann due to his "health issues and his age."[1]  (Jones Deposition at p. 58)  Jones terminated Eisenmann as Fernandez had requested; Eisenmann was 67 years old at the time.  Jeff Karr states in an affidavit that he heard Fernandez comment about AKKO's high insurance costs, and once heard Fernandez say "You guys need to get in better shape" because AKKO's "health care situation is out of control."  (Doc. 36, Karr Affidavit at ¶9.) Bill Bryant, an AKKO employee who retired in 2005, states that he heard Fernandez make comments during management meetings about AKKO's high insurance costs, and that Fernandez advised management that "we gotta keep these [employee] claims down." (Doc. 36, Bryant Declaration at ¶¶4, 9)

In August 2008, Jones told Fernandez that Jones' physician had advised him to have his pacemaker replaced, and that he would need additional surgery on another leaky heart valve at some point in the future.  Before he received any treatment for these

---

[1] Fernandez disputes this, testifying that he wanted to urge Eisenmann to retire.  The Court accepts Jones' version of the facts for purposes of reviewing AKKO's motion, as required by Rule 56.

issues, however, Jones was terminated in October 2008.

AKKO contends that Jones' termination was part of a necessary reduction in AKKO's work force.  Fernandez testified that over several years preceding 2008, the operating expenses of the manufactured parts division that Jones managed were steadily increasing, resulting in losses to the company.  In contrast, the purchased parts division was producing increased profits due to decreased operating expenses during the same period.  AKKO's financial consultant, David Biddle, prepared a summary chart of this information for the two divisions.  (See Jones Deposition Exhibit H, p. 3)  According to the chart, manufactured parts experienced an increase in expenses (as a percentage of total sales) for fiscal years 2005 to 2008 from 105.75% to 109.91%, while purchased parts experienced a decline in that ratio from 96.66% to 82.37%.  (The projected estimates for FY 2009 were 118.13% for manufactured parts, and 83.88% for purchased parts.) The chart also reflects the fact that purchased part sales, as a percentage of total company sales (expressed in dollars), were increasing, although total company sales declined over that period.

Based on the company's financial status, and at Biddle's urging, Fernandez decided to cut his workforce to reduce costs in the manufactured parts division.  He asked Beck to draw up a written restructuring plan, under which Jones and other

-4-

manufacturing employees would be terminated and their duties absorbed by other employees.  Beck's written plan, dated October 20, 2008 (Fernandez Exhibit 2), eliminated Jones' position as supervisor of manufactured parts, and divided his duties among four other employees.  Jones' management responsibilities were largely assumed by Beck, who is approximately 18 months younger than Jones.  The rest of Jones' duties were assumed by Patty Jones, Mike Bellamy, and Johnny Bryant, all of whom were AKKO employees at the time.

In addition to Jones, Justin Robinson (age 33), a quality assurance employee, was terminated because he had the least knowledge of the department; his duties were assumed by the QA manager.  Jimmie Marcum (age 50), a roller operator, was terminated and his duties absorbed by remaining operators.  The restructuring plan states that Marcum had been rehired by Jones two and a half months prior to the restructuring, after Marcum had quit his position with AKKO sometime in the prior year or two. Bill Smith (age 58), header operator, was terminated due to a combination of production and quality issues, which the plan describes as "not favorable in relation to his peers."  His duties were absorbed by remaining operators.  Greg Reynolds, Sr. (age 47), sorter operator, was terminated because his "regular personal phone calls have created interruptions to work.  His departmental peers perform admirably in all aspects."  His duties

-5-

were absorbed by other employees.  All five of these employees
were terminated on October 23, 2008.

Between November 2008 and January 2009, AKKO terminated
another nine employees in what Fernandez described as a
continuing reduction plan.  They were Larry Marcum, heading
operator (age 47); Jeffrey Karr, shipping supervisor (age 48);
Robert Kennedy, rolling operator (age 55); John Schierloh,
general warehouseman (age 46); Danielle Copeland, accounting &
human resources (age 35); John McCoy, heading operator (age 40);
Robert Mancz, heading lead (age 45); Michael Gibson, rolling lead
(age 55); and Michael Carnevale, purchasing agent (age 46).
Fernandez testified that by January 2009, AKKO had only two
employees remaining in the shop due to a lack of business.
(Fernandez Deposition at p. 107)  Jones notes that during that
four month period, AKKO terminated almost every employee over the
age of 45 who had a medical condition, including Jones, Gibson,
Kennedy, and Karr.  The employees who were retained did not
suffer from any comparable conditions or disabilities.

After these layoffs, AKKO briefly rehired Jimmie Marcum and
Larry Marcum, laid them off in April 2009, recalled them again
about ten days later, and terminated both of them in July 2009.
Robert Mancz (age 45) was recalled on January 26, 2009, and
Dorsey Pennington (age 46), a rolling operator who previously
worked for AKKO and had voluntarily quit his job sometime before

October 2008, was rehired in August 2009. Jones, Karr and Smith were not re-hired. In 2010, AKKO hired three new employees, all in their 20's, at low level positions. Greg Reynolds, Sr. was rehired on March 1, 2010. Beck testified that Jones was qualified to operate the manufacturing division's machinery, but he did not offer to re-hire Jones because Jones was "resistant to change." (Beck Deposition at p. 62)

<u>Procedural History</u>

Jones filed a charge with the EEOC on April 16, 2009, claiming that his termination was the result of age and/or disability discrimination. (Jones Deposition Exhibit D) The EEOC dismissed his claim on June 2, 2009. Jones' amended complaint in this case alleges age discrimination under federal and state law; a claim under the Americans with Disabilities Act and the analogous Ohio statute; a claim under the Family Medical Leave Act; and an ERISA claim, contending that AKKO discriminated against him because of his health insurance costs. (Doc. 4)[2] AKKO has moved for summary judgment, contending that Jones was terminated under a genuine reduction-in-force plan, and that Jones has not established a prima facie case of discrimination on any basis. Even if he had, AKKO argues that Jones has not raised a genuine factual dispute as to pretext.

---

[2] Jones voluntarily dismissed his FMLA claim; see Doc. 25.

**ANALYSIS**

Standard of Review

The standards for summary judgment are well established. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968)). The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. den., Superior Roll Forming Co. v. InterRoyal Corp., 494 U.S. 1091 (1990). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more

-8-

than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Electric Industries Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. <u>United States v. Diebold Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  <u>Id</u>. at 250.  "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir. 1979), <u>cert. dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) (citations omitted).

<u>Age Discrimination</u>

Under the ADEA, 29 U.S.C. §623(a), an employer is prohibited from discharging older employees because of their age. Jones can establish an ADEA claim by offering direct or circumstantial evidence of age discrimination. <u>Gross v. FBL Financial Services, Inc.</u>, 129 S.Ct. 2343 (2009). Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." <u>Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570</u> (6th Cir. 2003) (en banc). Jones does not rely on direct evidence, and his opposition memorandum is focused on circumstantial evidence. Circumstantial evidence is evidence  "... that does not on its face establish discriminatory animus, but does allow a fact finder to draw a reasonable inference that discrimination occurred." <u>Id</u>.

In <u>Gross</u>, the Supreme Court declined to affirmatively decide whether the <u>McDonnell-Douglas</u> burden-shifting analysis applies to ADEA claims based on circumstantial evidence. This Court is bound by Sixth Circuit authorities that the analysis does apply. See <u>Geiger v. Tower Automotive</u>, 579 F.3d 614, 622 (6th Cir. 2009), holding that the Circuit's prior case law applying the burden-shifting framework will control after <u>Gross</u>.

To establish a prima facie ADEA claim, Jones must establish that he is a member of a protected class, he suffered an adverse employment action, he was qualified for his job, and he was replaced by someone outside of his protective class.  In situations involving a reduction in force, the Sixth Circuit has applied a "heightened standard" to the fourth prong.  Geiger, 579 F.3d at 623, citing Asmo v. Keane, Inc., 471 F.3d 588, 592-93 (6th Cir. 2006).  In such cases, an ADEA plaintiff must come forward with additional evidence "tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."  In other words, "the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age."  Geiger, 579 F.3d at 623-624 (internal quotations and citations omitted).  Evidence that a plaintiff had superior qualifications to those of a similarly situated younger co-worker who was retained, can be sufficient to satisfy this burden.  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998);  Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992).

AKKO argues that Jones has presented no evidence satisfying this heightened standard.  Jones relies on a few offhand comments by Fernandez about older workers or insurance costs that are unrelated to the 2008 RIF.  Jones cannot establish that he was

-11-

replaced by a younger person, as all of Jones' job duties were assigned to other AKKO employees. The reassignment of job duties is not a "replacement" for purposes of a prima facie case under the ADEA. Even if Ed Beck could be considered as Jones' replacement by taking over his managerial responsibilities, Beck is only 18 months younger than Jones, which is too insignificant a difference in age to suggest discrimination. See, e.g., Grosjean v. First Energy Corp., 349 F.3d 332, 340 (6th Cir. 2003), concluding that a difference of six years or less between the plaintiff and a replacement is not significant, absent direct evidence of age discrimination. And, AKKO argues that Jones has no evidence that the younger employees who were retained after the RIF were similarly situated co-workers, or that Jones had better qualifications than they did.

Initially, Jones disagrees with AKKO's suggestion that a "heightened" standard applies to his prima facie case. He contends that the fourth prong is modified so that he need not identify a replacement outside of his protected class. He argues that he simply has to demonstrate other direct, circumstantial or statistical evidence indicating he was singled out due to his age.

In Geiger, the Sixth Circuit specifically used the phrase "heightened standard" to describe the modified fourth prong in a work force reduction situation, relying on prior cases describing

the applicable burden as requiring "additional" evidence that
suggests discrimination.  Whether this requirement is described
as a "heightened" standard or as a burden of coming forward with
"additional" evidence, Jones argues that he has satisfied his
prima facie burden.  In addition to Fernandez' comments about
older workers, Jones cites (1) AKKO's decision to retain younger
employees Mike Bellamy and Johnny Bryant in their positions while
terminating Jones; (2) its decision to later rehire Larry and
Jimmy Marcum, Greg Reynolds, and Dorsey Pennington, but not to
rehire Jones; and (3) AKKO's hiring of three much younger new
employees in 2010.  Jones cites <u>Blair v. Henry Filters</u>, 505 F.3d
517, 529 (6th Cir. 2008), which noted that the types of evidence
that may satisfy the fourth prong in an RIF case "are merely
various context-dependent ways in which a plaintiff **may** establish
a prima facie case, and [are] not rigid requirements that all
plaintiffs with similar claims must meet regardless of context."
(emphasis in original)

In <u>Blair</u>, the court reversed a summary judgment granted to
an employer, finding that plaintiff had stated a prima facie case
of age discrimination arising from an alleged RIF layoff, and
that he had raised a genuine dispute as to pretext.  The
employee's supervisor, the individual who terminated his
employment, repeatedly called him "the old man" at sales
meetings, and once asked others present, "do you think the old

guy can make it up the stairs?"  The supervisor also transferred plaintiff from a profitable sales account to another less-profitable account, telling plaintiff that he was "too old" to continue working on the profitable account.  When the company began experiencing financial difficulties between 2001 and 2003, it terminated 67 employees and did not replace 24, shrinking its payroll from 143 to 52.  Plaintiff was terminated in August 2003, when his supervisor called him during his vacation to tell him he was losing his job.  The Sixth Circuit concluded that the supervisor's statements about plaintiff's age, and the loss of his profitable account, were sufficient to establish the fourth prong of his prima facie case.  More importantly, the record failed to disclose evidence that the company's RIF was conducted according to an objective plan.  The court noted that large numbers of employees lost their jobs but there was no record of when the reductions started, no blueprint that explained the decisions, and the layoffs appeared to be "chaotic, occurring in fits and starts."  Id. at 533.

Here, the comments made by Fernandez, expressing "surprise" about the number of workers over 40, or his directive to Jones concerning Eisenmann's termination, are not comparable to the negative comments made **about the plaintiff** by his supervisor in Blair.  Expressing "surprise" about the number of over-40 employees in a manufacturing plant does not necessarily raise a

-14-

reasonable inference of age bias, absent some suggestion that
Fernandez believed those employees were less able to perform
their jobs because of their age.  And his comments about
Eisenmann (who was in fact substantially older than plaintiff,
and in fact had apparently some serious health issues) almost a
year before the RIF, does not indicate that Jones was later
singled out for termination based on his age.

Unlike the situation in <u>Blair</u>, the October 2008 terminations
followed a written plan.  And the subsequent layoffs over the
next three months resulted in AKKO's manufacturing workforce
being reduced to two employees.  Jones has not contested that
fact, and has not presented any persuasive analysis suggesting
that the wave of terminations was based on age.

The fact that the employees whom AKKO retained (Bellamy and
Bryant) after the 2008-2009 terminations were younger than Jones
is insufficient in the absence of evidence demonstrating that
Bellamy and Bryant were similarly situated, or that Jones has
superior skills.  Jones was a supervisor and a department head
who reported directly to Fernandez.  Mike Bellamy was a heading
supervisor (age 43), and Johnny Bryant was a rolling supervisor
(age 47), both of whom reported to Jones.  AKKO was not required
to terminate these employees and offer their jobs to Jones, after
AKKO decided to eliminate Jones' position.  Moreover, other
employees who were retained after the RIF included Greg Boyd,

-15-

maintenance supervisor (age 53), Rob Boyles, quality engineer
(age 43), and Jim Hall, an engineer (age 56).

Jones also cites the fact that AKKO recalled Robert Mancz in
January 2009 and rehired Dorsey Pennington in August 2009. Both
of these employees were younger than Jones, yet Jones was not
offered the opportunity to fill the positions for which they were
re-hired. Jones argues that he was able to do "all" of the jobs
at AKKO because of his long experience there, but he has not
established that he had better or superior abilities than either
Mancz, who worked in the heading department, or Pennington, who
was a rolling operator. The Court concludes that all of this
evidence, considered together, does not meet the "heightened
standard" required for a prima facie case as discussed in Geiger.

But assuming that Jones could establish his prima facie
case, the burden of production shifts to AKKO to articulate a
legitimate, nondiscriminatory reason for including Jones in the
RIF. It has done so. Fernandez testified that the increasing
costs in Jones' department, as contrasted with the purchased
parts department, required AKKO to reduce its manufacturing labor
force. He made the decision to eliminate Jones' position, and
have Beck assume Jones' managerial responsibilities. David
Biddle, AKKO's financial consultant, prepared regular financial
reports for the company, and prepared the chart comparing the two
departments' expense ratios. Biddle testified that he told

-16-

Fernandez he had to reduce the size of the company if it was going to survive, and that the bank that loaned money to AKKO would not tolerate losses like those AKKO was experiencing. (Biddle Deposition at pp. 13-14, 18-20.)

Jones must then show that AKKO's articulated reason is mere pretext. He can establish pretext by showing (1) the employer's reason has no factual basis; (2) the reason did not actually motivate the employer; or (3) the articulated reason is insufficient to justify the adverse action taken. <u>Wexler v. White's Fine Furniture</u>, 317 F.3d at 576. As the Supreme Court held in <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148 (2000), "A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."

Jones argues that a jury could consider Fernandez' alleged discriminatory remarks as evidence that the reason for Jones' termination was not the RIF, but rather was his age. He cites <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344 (6th Cir. 1998), and <u>Risch v. Royal Oak Police Department</u>, 581 F.3d 383 (6th Cir. 2009), cases finding that plaintiffs had produced sufficient evidence of pretext to avoid an employer's summary judgment motion. In those cases, a pervasive atmosphere of bias and prejudice existed in the workplace, reflected in a series of

comments or actions that strongly suggested pretext.  In
Ercegovich, a vice-president of plaintiff's division remarked at
a staff meeting that "this company is being run by white haired
old men waiting to retire, and this has to change."  Another
personnel manager told plaintiff that the vice-president "had
directed that he did not want any employee over 50 years old on
his staff."  These remarks could not be objectively characterized
as "ambiguous" or "abstract," and strongly suggested the vice-
president's bias against older workers.  Id. at 354-355.  Other
managerial-level employees had remarked that some people who were
losing their jobs "will be replaced by younger college grads at
less money," and another had stated that "there will be no more
promotions of anyone – to different departments – for anyone over
age 51."  Id. at 356.

     And in Risch, the court found evidence that male officers
frequently made degrading comments about female officers'
capabilities, often commented that female officers would never be
promoted to command positions, and made generally degrading
remarks about women, was probative of pretext in plaintiff's
gender discrimination claim based on a failure to promote her to
a command position.  The evidence Jones recites here (Fernandez'
few comments about the age of the work force and Eisenmann's age)
to suggest pretext pales in comparison to the evidence adduced in
Ercegovich and Risch.

Jones also argues that AKKO's RIF plan, like the plan at issue in Blair v. Henry Filters, lacked an objective basis.  He claims that AKKO has not adequately explained why the five employees were chosen in October 2008.  He also argues that AKKO has not produced any written plan governing the subsequent layoffs in the following three months.  As to the latter issue, Beck testified that the October 2008 layoffs were the result of a restructuring plan because the manufacturing production manager's job (Jones' position) was eliminated.  The November-January layoffs were not implemented with a written plan because "[i]t was just a matter of business adjusting the labor to the decline in sales.  It wasn't really a restructure, we weren't changing managerial or supervisory roles, I don't believe, it was strictly a labor reduction." (Beck at p. 85)  This testimony does not raise an inference that these layoffs lacked **any** objective reason, as Jones suggests.

As to the written restructuring plan, Jones contends that the underlying data concerning expenses and sales of AKKO's two departments was not objective, because AKKO has not adequately explained how the data was created, or how the costs and expenses were specifically allocated between the departments.  David Biddle, AKKO's financial consultant, testified that he began consulting for AKKO in 2004.  He performs similar services for approximately 12 other small businesses.  Biddle prepares daily

cash flow and monthly financial reports, as well as a variety of periodic reports requested by management.  Biddle was asked how various types of costs were allocated between AKKO's two departments.  Biddle said AKKO uses a cost allocation model, which he described as "rather complex", and one that he helped construct sometime after he started working with the company. The allocation model was generally updated yearly.  Biddle described the cost allocation model as something that many businesses use, and that he helped develop AKKO's model based on several different indicators (what he called "cost drivers") such as sales volume dollars, or interviews with employees concerning how their was time on the job was spent.  Biddle could not describe with precision how each individual cost item was divided or allocated.  He also testified that some of AKKO's general ledger accounts were specifically set up to automatically capture costs related to purchased versus manufacturing parts, in order to get a "clearer picture of the business."  (Biddle Deposition pp. 46-48.)

       This testimony contradicts Jones' assertion that the cost allocations, and the RIF implemented as a result of those financial reports, lacked any objective basis.  Biddle's inability to describe the specific allocation for a particular cost item does not contradict the balance of his testimony demonstrating that the model was developed based on objective

data.  Jones suggests that the underlying data was unreliable, but he has no facts or evidence to support that suggestion.  An employer's decision or its judgment on an employment matter may be mistaken, and there may have been other ways for AKKO to cut its expenses in order to avoid Jones' termination.  But a plaintiff cannot establish a genuine question of pretext by simply challenging the soundness of an employer's decision.  See Gray v. Toshiba Am. Consumer Prods., 263 F.3d 595, 600 (6th Cir. 2001) (noting that the court "...  may not reject an employer's explanation unless there is sufficient basis *in the evidence* for doing so.") (internal citations and quotations omitted; emphasis in original).  Jones' speculation that the cost allocations were not accurate is not enough to raise an inference of pretext.

Jones also relies on Fernandez' failure to fully explain the "key metric" for evaluating Jones' performance, which was to manage departmental costs.  Fernandez admitted that he had never addressed this "key metric" in a written performance evaluation for Jones.  But Fernandez testified that he routinely did not prepare written job evaluations for Jones, and that he provided feedback orally and in many meetings with Jones.  Absent any evidence suggesting that Fernandez' routine procedure is suspect, this argument does not raise an inference of pretext.

Finally, Jones argues that Fernandez has provided conflicting reasons for his termination.  During his deposition,

-21-

Fernandez testified that the reason Jones was terminated was the lack of profitability for Jones' department caused by inefficient management.  When asked what those inefficiencies were, Fernandez said that Jones did not manage his labor costs, that he was not "managing the capacity correctly ..." by "working overtime when we shouldn't have been working overtime.  People were slowing down, and he wasn't doing anything about it." (Fernandez Deposition at p. 58)  Fernandez also testified that he learned after Jones was terminated that some of his employees were fearful of Jones, but then he recalled a complaint about Jones from Mike Bellamy and Greg Boyd sometime in early 2008. Fernandez spoke to Jones about the issue, which resulted in Jones assigning Bellamy to unnecessarily difficult tasks.

Bellamy testified that he recalled a conversation with Fernandez after Jones was terminated, involving an incident where Jones slammed his hand down on a table in front of a customer. When Bellamy was asked about any conversations about Jones that he had with Fernandez **before** Jones was terminated, he responded "No, I don't think so.  I mean, I'll just leave it at that." When asked if Jones had ever retaliated against him, Bellamy replied "You have to give me a while to really think about this. I don't know.  If he would have, I don't remember what it would have been for; it's been - it would have been that long ago."  He could not recall talking with Fernandez about any retaliation he

-22-

may have experienced from Jones.  (Bellamy Deposition p. 33)

Jones argues that this "stark contrast" in the testimony could lead the jury to reject Fernandez' description of Jones' inability to manage his employees, and thus reject Fernandez' entire explanation for Jones' termination.  He cites <u>Brown v. Clarke Power Services</u>, 2009 U.S. Dist. LEXIS 41700 (S.D. Ohio, May 18, 2009), where contradictory testimony from two employer's witnesses about the reason for jobs being eliminated in an RIF was sufficient to defeat summary judgment.  The decision-maker testified that he made the RIF decisions based on his analysis of the requirements and needs at the company's 28 locations.  But the company's HR specialist testified that the decision-maker led her to believe that his decisions were based on salaries, and that highly compensated employees were chosen for termination. Moreover, the plaintiff produced evidence that the employer decided to terminate Brown without talking to her day-to-day supervisor who had the most knowledge of her skills.  The decision-maker relied on dated comments about Brown's computer abilities and skills, and did not even know if Brown had trained on the company's new computer system since those comments had been made.  The decision maker did not know about Brown's duties as compared to employees who were not terminated, and Brown's direct supervisor testified that Brown had the skills and knowledge to perform the positions that remained after the RIF.

In addition, the employer terminated Brown in part based on the assumption that the company would stop using an older computer system, on which Brown had extensive skills and knowledge.  But at the time of the summary judgment motions, that system was still in use at the company.  All of these facts demonstrated a genuine factual dispute whether the decision to terminate Brown was based on the facts offered by the employer.  Here, at best, the testimony Jones relies on reflects a different recollection of whether Bellamy may have said something to Fernandez about Jones before he was terminated.  Bellamy did not deny that Jones had retaliated against him, he could not remember whether that had happened.  Moreover, Fernandez consistently testified that Jones was terminated and his position eliminated based on the financial results, not on anything Jones may have done concerning Bellamy.

Cases that find an employer's contradictory positions to be probative evidence of pretext involve more than a conflict between two witnesses' recollection.  See, e.g., <u>Conley v. U.S.</u> <u>Bank</u>, 211 Fed. Appx. 402, 408 (6th Cir., December 12, 2006) (unpublished), noting that despite some inconsistencies among plaintiff's supervisors about the degree his job performance played a role in his RIF termination, the employer's proffered reason for that termination - Conley scored lowest on the employer's overall performance ranking - did not change.  The

same is true here.  Fernandez testified that the reason Jones was selected for termination was the increasing costs and declining profits in Jones' department.

In sum, the Court concludes that Jones has not produced evidence giving rise to a genuine factual dispute that AKKO's explanation for Jones' termination is mere pretext for age discrimination.  AKKO is therefore entitled to summary judgment on Counts Three and Four of the amended complaint.

<u>Disability Discrimination</u>

Counts Five and Six of Jones' complaint allege that AKKO terminated his employment because he is disabled.  Ohio law parallels the ADA in all relevant respects, and the same analysis applies to Jones' federal and state disability claims.  <u>Daugherty v. Sajar Plastics, Inc.</u>, 544 F.3d 696, 702 (6th Cir. 2008).  To establish a prima facie case, Jones must show that: (1) he is disabled within the meaning of the Act; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) AKKO knew or had reason to know of his disability; and (5) after termination, the position remained open, or Jones was replaced by a non-disabled employee.  <u>Hopkins v. Elec. Data Sys. Corp.</u>, 196 F.3d 655, 660 (6th Cir. 1999).

AKKO argues that it is entitled to judgment on these claims because Jones has not established a prima facie case, in that he

was not disabled, and that he cannot satisfy the heightened evidentiary standards applicable to an RIF. AKKO also argues that Jones has not established a genuine dispute on pretext, for largely the same reasons discussed with respect to Jones' age discrimination claims.

The Americans with Disability Act, 42 U.S.C. §12102(2), effective when Jones was terminated in October 2008, defined "disability" as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;
>
> (B) a record of such impairment; or
>
> (C) being regarded as having such an impairment.[3]

Department of Labor regulations define a "physical or mental impairment" to include any physiological disorder or condition of the cardiovascular system. 29 C.F.R. § 1630.2(h). "Major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

With regard to the "regarded as disabled" statutory definition, the Supreme Court has explained:

> There are two apparent ways in which individuals may fall within this statutory

---

[3] The ADA amendments effective January 1, 2009 do not apply retroactively to conduct occurring before the amendments. See Mulholland v. Sumner County Board of Ed., 569 F.3d 562, 567 (6th Cir. 2009).

> definition: (1) a covered entity mistakenly
> believes that a person has a physical
> impairment that substantially limits one or
> more major life activities, or (2) a covered
> entity mistakenly believes that an actual,
> nonlimiting impairment substantially limits
> one or more major life activities. In both
> cases, it is necessary that a covered entity
> entertain misperceptions about the individual
> - it must believe either that one has a
> substantially limiting impairment that one
> does not have or that one has a substantially
> limiting impairment when, in fact, the
> impairment is not so limiting.

Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999). "This part of the Act is intended to allow individuals to be judged according to their actual capacities, rather than through a scrim of myths, fears, and stereotypes accruing around a perceived impairment."  Mahon v. Crowell, 295 F.3d 585, 592 (6th Cir. 2002) (internal citation and quotation marks omitted).

Jones argues that his congenital aortic valve disease, a physical impairment that has required several surgeries and implantation of a pacemaker, is a statutory disability because it substantially limits several of his major life activities.  Jones submitted an affidavit with his opposition to AKKO's motion stating that he cannot mow his lawn without taking breaks, shovel snow from his driveway, or walk for long distances.  The Supreme Court has held that the terms "substantially limits" and "major life activities" need to be interpreted strictly, and that they "create a demanding standard for qualifying as disabled ...".  Toyota Motor Mfg. v. Williams, 534 U.S. 184, 197 (2002).  Jones'

-27-

inability to shovel snow, or to walk for undefined "long distances," do not qualify as impairments that "substantially limit" his "major" life activities under the regulations as applied in Toyota Motor.

Jones also states that he was diagnosed with sleep apnea in 1998, which is related to his cardiovascular condition. His condition is not satisfactorily controlled with a prescribed CPAP machine, and leaves him often feeling sleepy and fatigued. Jones EEOC complaint states that he has heart disease, high blood pressure and high cholesterol. At his deposition, he was asked about his interrogatory response identifying the two doctors (his cardiologist and his primary care physician) that he had seen in the prior three years. Jones was asked if he had seen these doctors for health problems other than his heart condition. He responded "for different issues," mentioning gout, "... aches and pains and not feeling good." (Jones Deposition pp. 89-90) Jones has evidently been able to function with sleep apnea since 1998. While sleep apnea may well constitute a disability for some individuals, Jones' descriptions of the effects of his condition are insufficient to establish the level of severity required to qualify as a "substantial limitation" on major life activities. See, e.g., Boerst v. Gen. Mills Operations, 25 Fed. Appx. 403, **12 (6th Cir. 2002) (unpublished), noting that the inability to get more than two to four hours sleep at night, while

inconvenient, lacks the kind of severity required to qualify the ailment as a substantial limitation.

Jones then argues that AKKO regarded him as having a disability and terminated his employment because of that perception.  He relies on the fact that Fernandez knew about his heart condition, and knew that he had surgery in 1996 to replace a heart valve.  He also cites Fernandez' testimony that he was "scared" of Jones' "serious issue," which Fernandez described as "spooky."

Fernandez testified that he knew that Jones had medical issues since Jones was 28 years old, but that Fernandez "didn't see anything wrong with it.  I mean, you know, at first I was kind of scared about it and everything else, but he was resilient, he was tough.  And whenever he went into the hospital, I always wanted him to come back as soon as he could."  When asked why he was "scared," Fernandez responded:  "It was a serious issue.  I mean, he was so young, at the time, and then he had one and he almost passed away from it; it was spooky.  It's spooky to see people that you work with, you know, they get sick and everything else."  (Fernandez Deposition at pp. 83-84)[4]

Fernandez' feelings about Jones' heart condition do not reflect the kind of myths or stereotypes about disabilities that

_____

[4] Jones' first valve operation was in 1980, when he was approximately 28 years old.

the ADA is intended to combat.  The description of open-heart
surgery as a "serious issue," or Fernandez' admission that he was
"kind of scared" at the thought of Jones undergoing such surgery,
do not reflect discrimination or bias based on an alleged
disability.  Moreover, the last episode that Fernandez describes
as "scary" and "spooky" occurred twelve years before Jones'
termination.  This Court is fully aware that discriminatory
attitudes can be subtle and nuanced.  But the cases finding
sufficient evidence of an employer's discriminatory attitude
involve far more than the meager evidence Jones relies on here.

In Ross v. Campbell Soup Co., 237 F.3d 701 (6th Cir. 2001),
for example, plaintiff suffered a series of back injuries at work
from 1987 through late 1993, each time taking leave from work and
returning without requesting any accommodations.  Shortly after
his fifth injury (from which he had not yet returned to work),
one of plaintiff's supervisors sent a memo titled "Dale Ross Back
Injury History" to another supervisor.  That led to a demand that
Ross return to work based on his own physician's opinion that he
could do so.  A few months after he returned to work, he received
a negative performance review and was put on probation.  Near the
end of that period, one of his supervisors wrote on a memo, "When
can we bring this problem person to a termination status.  P.S. -
Back Case."  Id. at 704.  This evidence, along with the fact that
Ross was qualified for his job and his employer offered varying

justifications for his termination, were sufficient to avoid summary judgment.

And in <u>Mulholland v. Sumner County Bd. of Ed.</u>, 569 F.3d 562 (6th Cir. 2009), plaintiff had previously been diagnosed with inflammatory arthritis, a fact her supervisors and other management personnel knew about.  A few years later when working as an assistant school principal, plaintiff met with her supervisor to discuss problems with her increasing workload and a co-employee; the supervisor asked her "Don't you think it would be easier on your health if you would just go back to the classroom?"  Over her objections, she was transferred to a different school in a classroom teaching position.  The Sixth Circuit affirmed the district court's summary judgment to her employer, holding that the fact that defendants knew of her medical condition did not support a conclusion that they misperceived her as being physically impaired.  Similarly, in this case, Fernandez was certainly aware of Jones' heart condition for many years.  But his awareness and his comments about its seriousness do not support a reasonable inference that he perceived Jones as disabled, in the absence of any other evidence supporting that conclusion.

Even if Jones could satisfy the first prong of his prima facie case, he must have additional evidence suggesting that the reason he was terminated was his disability.  Jones relies on

AKKO's decision to retain what Jones describes as "non-disabled" employees and to terminate "disabled" employees.  Other than the descriptions of some of the medical conditions of his co-workers (e.g., unspecified foot problems, diabetes, breathing problems), there is insufficient evidence in the record from which the Court could conclude that any of these individuals are "disabled" under the ADA, or that AKKO actually regarded any of them as disabled.  Again, the fact that Fernandez may have been aware of medical problems of some of the employees is not enough to raise a reasonable inference that he regarded those employees as disabled.

Assuming that Jones could establish a prima facie claim of disability discrimination, however, AKKO has met its burden of coming forward with a legitimate reason for Jones termination, the RIF.  Jones relies on the same evidence and arguments presented with respect to his age discrimination claims, and claims that the RIF is a pretext for disability discrimination. He argues that "all" of AKKO's disabled or perceived-as-disabled employees were terminated, leaving only younger non-disabled employees.  As already stated, Jones has not established that the other employees were in fact disabled.  For this reason, and the reasons discussed above with respect to Jones' age discrimination claim, the Court finds that Jones has not established a genuine factual dispute on pretext for disability discrimination.

ERISA Discrimination Claim

29 U.S.C. §1140 makes it unlawful "... to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, ...".  ERISA discrimination claims may be proven by direct or indirect evidence, the latter under the same burden-shifting analysis that applies to age and disability discrimination claims.  A prima facie case is demonstrated by showing prohibited employer conduct, taken for the specific purpose of interfering with any of the employee's ERISA rights.  Shahid v. Ford Motor Co., 76 F.3d 1404, 1411 (6th Cir. 1996) (internal quotation and citations omitted).  The burden then shifts to AKKO to demonstrate a legitimate reason for its action.  Jones must then produce sufficient evidence of pretext.  See Pennington v. Western Atlas, Inc., 202 F.3d 902, 906 (6th Cir. 2000).

Jones argues that he was terminated because he told Fernandez in August that he needed a new pacemaker, and would likely have to have heart surgery in the future.  Jones relies on Fernandez' complaints about high health insurance costs to establish a causal connection.  He cites the fact that in 2007, AKKO's total health insurance expense was $237,879, and it

increased to $254,814 in 2008.  After reducing AKKO's workforce by eliminating most if not all of the employees with health problems, AKKO's 2009 cost was $153,344.  (Copeland Deposition at p. 36 and Exhibit 1)  Jones argues that the temporal proximity between informing Fernandez about his need for treatment and his termination, combined with the evidence about costs, satisfies his prima facie burden.

In Shahid, the Sixth Circuit found that the close temporal proximity between the offer to plaintiff to participate in a severance pay program, and the employer's decision to terminate the employee instead, supported an inference of intentional interference with plaintiff's right to participate in the pay program, and was sufficient to state a prima facie case.  Here, the Court concludes that Jones' evidence is sufficient to satisfy his prima facie burden, recognizing that Jones need not show that AKKO's **sole** or major reason for terminating him was to interfere with his ERISA benefits, but only that it was a "motivating factor."  Shahid, 76 F.3d at 1411 (internal citation omitted).

AKKO again relies on the RIF to demonstrate its legitimate nondiscriminatory reason for Jones' termination, which is sufficient to satisfy its burden.  To establish pretext, Jones relies on much of the same evidence discussed with respect to his other claims, arguing that Fernandez' motivating reason for choosing employees for termination was to lower AKKO's health

insurance costs.  With respect to that issue, Danielle Copeland
testified that AKKO's insurance broker told her that small
businesses all over were seeing increased health insurance rates,
and that rates were increasing "across the board" with no
specific reasons given.  (Copeland Deposition at pp. 34, 39)
David Biddle also testified that, in his experience, every small
business president or owner for whom he worked had complained to
him about the rising costs for employee medical insurance, which
Biddle thought were rising for every small business.  (Biddle
Deposition pp. 37, 55)

Copeland also testified about a chart prepared by AKKO's
insurance broker illustrating AKKO's cost per employee of
insurance coverage for the years 2004 through 2009.  (Copeland
Exhibit 5).  That chart reflects that per-employee costs for what
Copeland described as the better "buy up" plan that most, if not
all AKKO employees chose, increased from $265.45/month/employee
in December 2004 to $593.96/month/employee in December 2009.
Immediately after the October 2008 layoffs, the per-employee cost
(as of December 1, 2008) was $517.71/month.  Jones' reliance on
the total of the company's costs for insurance, which clearly
declined from 2008 to 2009, is undercut by the fact that AKKO's
per-employee cost kept escalating, negating any inference that
costs could be effectively reduced by terminating all of AKKO's
employees with medical issues.  Moreover, the total cost

reduction from 2008 to 2009 largely reflects the percentage by which AKKO's total labor costs declined, due to the RIF and layoffs that followed.

Jones also relies on an affidavit from William Bryant, a former AKKO employee who left the company in 2004 or 2005. Bryant states that Fernandez made comments during management meetings about high insurance costs, which he related to the number of employee claims.  Bryant states that Fernandez said at one such meeting, "we gotta keep these claims down."  Bryant also asserts, based only on Fernandez' comments, that AKKO actually kept track of its employees' medical claims.  (Doc. 36, Exhibit 6)  There is absolutely no evidence in the record suggesting that Bryant is correct in this belief.  Moreover, Bryant left the company three or four years before Jones' termination, and long before the RIF plan was developed and implemented.

Jeff Karr states in his affidavit that he heard Fernandez once say, "You guys need to get in better shape because our health care situation is out of control."  (Doc. 36, Exhibit 4 at ¶9) This comment is not tied in any way to the RIF, or to any decision to terminate any employee including Jones.  Considering all of Fernandez' comments and complaints about health care costs, they do not rise to the level that is sufficient to raise a factual dispute concerning pretext on Jones' claim of ERISA discrimination.

**CONCLUSION**

For all of the foregoing reasons, the Court concludes that Plaintiff has failed to establish a colorable claim that his termination was the result of age or disability discrimination, or because Defendant intentionally interfered with his ERISA rights.  Therefore, Defendant's motion for summary judgment (Doc. 27) is granted.  Plaintiff's amended complaint is dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: August 23, 2010        <u>s/Sandra S. Beckwith</u>
                              Sandra S. Beckwith
                              Senior United States District Judge